IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-02391-NYW

MELVIN T. ANTHONY,

    Plaintiff,

v.

COMMISSIONER, SOCIAL SECURITY ADMINISTRATION,

    Defendant.

## MEMORANDUM OPINION AND ORDER

Magistrate Judge Nina Y. Wang

This civil action arises under Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 1381-83(c), for review of the Commissioner of the Social Security Administration's ("Commissioner" or "Defendant") final decision denying Plaintiff Melvin Anthony's ("Plaintiff" or "Mr. Anthony") application for Supplemental Security Income ("SSI"). Pursuant to the Parties' consent [#13], this civil action was referred to this Magistrate Judge for a decision on the merits. *See* [#20]; 28 U.S.C. § 636(c); Fed. R. Civ. P. 73; D.C.COLO.LCivR 72.2. Upon review of the Parties' briefing, the entire case file, the Administrative Record, and the applicable case law, this court respectfully **AFFIRMS** the Commissioner's decision.

## LEGAL STANDARDS

SSI is available to an individual who is financially eligible, files an application for SSI, and is disabled as defined in the Act. 42 U.S.C. § 1382. An individual is under a disability only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]" 42 U.S.C.

§ 13382c(a)(3)(B). The disabling impairment must last, or be expected to last, for at least 12 consecutive months. *See Barnhart v. Walton*, 535 U.S. 212, 214-15 (2002); *see also* 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. § 416.905. And when a claimant has one or more physical or mental impairments, the Commissioner must consider the combined effects in making a disability determination. 42 U.S.C. § 1382c(a)(3)(G). The earliest a claimant can receive SSI is the month following the month within which the claimant filed her application, and thus the claimant must establish that she was disabled on or prior to her application date. *See* 20 C.F.R. §§ 416.200, 416.335; *see also id.* § 416.912(b)(1) ("Before we make a determination that you are not disabled, we will develop your complete medical history for at least the 12 months preceding the month in which you file your application").

The Commissioner has developed a five-step evaluation process for determining whether a claimant is disabled under the Act. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). These include:

1. Whether the claimant has engaged in substantial gainful activity;

2. Whether the claimant has a medically severe impairment or combination of impairments;

3. Whether the claimant has an impairment that meets or medically equals any listing found at Title 20, Chapter III, Part 404, Subpart P, Appendix 1;

4. Whether the claimant has the Residual Functional Capacity ("RFC") to perform her past relevant work; and

5. Whether the claimant can perform work that exists in the national economy, considering the claimant's RFC, age, education, and work experience.

*See* 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v). *See also Williams v. Bowen*, 844 F.2d 748, 750-52 (10th Cir. 1988) (describing the five steps in detail). "The claimant bears the burden of proof through step four of the analysis[,]" while the Commissioner bears the burden of proof at step five. *Neilson v. Sullivan*, 992 F.2d 1118, 1120 (10th Cir. 1993). "If a determination

can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (internal quotation marks omitted).

In reviewing the Commissioner's final decision, the court limits its inquiry to whether substantial evidence supports the final decision and whether the Commissioner applied the correct legal standards. *See Vallejo v. Berryhill*, 849 F.3d 951, 954 (10th Cir. 2017). "Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Noreja v. Comm'r, SSA*, --- F.3d ----, ----, 2020 WL 1057276, at *4 (10th Cir. Mar. 5, 2020) (internal quotation marks omitted); *see also Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005) ("Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion."). "But in making this determination, [the court] cannot reweigh the evidence or substitute [its] judgment for the administrative law judge's." *Smith v. Colvin*, 821 F.3d 1264, 1266 (10th Cir. 2016).

## ANALYSIS

I. **Background**

A. **Medical History**

Mr. Anthony, born December 22, 1959, alleges he became disabled on July 11, 2013, just shy of 54-years-of-age, due to blindness in his left eye, failing vision in his right eye, third degree burns on his left arm, and a head injury. *See* [#11-3 at 76-77, 79;[1] #11-6 at 253-58; #11-7 at 289, 294, 311, 319]. As a teenager, Mr. Anthony lost sight in his left eye, which strains vision in his right eye and interferes with his ability to drive. *See* [#11-2 at 56-58; #11-7 at 302-03, 304, 306,

---

[1] When citing to the Administrative Record, the court utilizes the docket number assigned by the CM/ECF system and the page number associated with the Administrative Record, found in the bottom right-hand corner of the page. For all other documents the court cites to the document and page number generated by the CM/ECF system.

3

308, 309, 328; #11-9 at 470-72, 525]. Mr. Anthony explained that he experiences sharp pain in his left eye, pain exacerbated by focusing too long on a certain object, though resting his eyes helps alleviate that pain. *See* [#11-7 at 302].

In 2013, Mr. Anthony suffered severe burns on both upper extremities that required skin grafts. *See* [#11-2 at 58-60; #11-8 at 442; #11-9 at 515, 525, 537-38, 541, 542]. Beginning in August 2013, Plaintiff began rehabilitation services at the Centura Center of Rehab, and an occupational therapist assessed Mr. Anthony as suffering from "significant" burns on his left arm, more so than his right arm, with limited range of motion, decreased strength, and 8/10 pain. *See* [#11-8 at 444-45]. Progress notes dated September 13, 2013, report that Mr. Anthony "has been compliant with surgery," "has made strength gains," and "has made improvements in [range of motion] particularly the wrist," but experienced issues with elbow extension. *See* [*id.* at 446-47]. On November 4, 2013, Plaintiff's occupational therapist reported that Plaintiff "has good underlying strength, he has continued to improve his grip strength and pinch strength each and every time he is assessed," and was close to achieving the "material handling ability to perform work activities"; was limited in his left wrist flexion and full left elbow extension; and that he was progressing strength-wise towards being able to perform his roofing job, though the occupational therapist did not express an opinion as to whether Mr. Anthony's upper extremities could tolerate the exposure to heat. *See* [*id.* at 448-49].

On November 20, 2013, Mr. Anthony presented to the Hand Surgery Associates for evaluation of possible surgical treatment of elbow contracture. *See* [*id.* at 382]. Treatment notes from this visit reveal Mr. Anthony was alert and oriented, in no acute distress, had full finger and wrist range of motion, and suffered from a mild elbow flexion contracture that the treating provider recommended a more intensive therapy regimen for. *See* [*id.* at 383]. Mr. Anthony returned to

4

the Hand Surgery Associates on January 9, 2014, and treatment notes reveal "Mr. Anthony has made notable improvement since his last examination," full elbow flexion, well-healed skin grafts, and did not require surgical intervention. *See* [*id.* at 384]. Plaintiff continued rehabilitation on January 22, 2014, and progress notes indicate he was "doing well" and using his elbow splints to increase straightness, and that he could lift 75 pounds, which equated to medium exertion work. *See* [*id.* at 442-43].

Mr. Anthony underwent a consultative examination with Timothy Moser, M.D. on February 28, 2015. *See* [*id.* at 386]. Mr. Anthony disclosed that he arises each morning around 7:00 a.m., and occasionally cooks, washes dishes, vacuums, sweeps, mops, goes to the park, collects scrap metal, and watches television. *See* [*id.* at 387]. A physical examination revealed that Mr. Anthony was alert and oriented, in no apparent distress, ambulated normally, sat comfortably, transferred without difficulty, wore any eye patch over his left eye, demonstrated normal fine manipulation and grip strength, and full motor strength bilaterally in upper and lower extremities. *See* [*id.* at 387-89]. Dr. Moser assessed no restrictions for standing, walking, sitting, lifting, carrying, posturing, manipulating, as well as no need for medical assistive devices or environmental restrictions. *See* [*id.* at 389].

Mr. Anthony suffered an acute finger fracture on his right ring finger on May 29, 2016; he was prescribed an ulnar gutter splint and narcotic pain medication and was directed to schedule an appointment with an orthopedic surgeon. *See* [*id.* at 420-23]; *see also* [#11-10 at 567-70]. On June 18, 2016, Mr. Anthony returned to the emergency room complaining of worsening pain associated with his fractured right ring finger, and doctors prescribed Mr. Anthony a new aluminum splint that was more comfortable. *See* [#11-8 at 417-18]. Mr. Anthony underwent surgery for his acute finger fracture on June 29, 2016, *see* [*id.* at 463-69; #11-9 at 525, 527-28,

5

530-31], but returned to the emergency room on July 12, 2016, complaining of swelling and radiating pain, and doctors discharged Mr. Anthony with instructions to ice, elevate, and rest his right hand, *see* [#11-8 at 398-400, 404-06]. Because of an infection, doctors removed the surgical pin from Plaintiff's right ring finger on July 13, 2016. *See* [*id.* at 454-57]. But on July 21, 2016, Mr. Anthony's follow-up appointment treatment notes reveal that he "continues to be noncompliant" with recovery because he continued to utilize his right hand despite instructions to the contrary. *See* [*id.* at 450-53].

Plaintiff presented to Southern Colorado Family Medicine for an annual examination on July 25, 2017. [#11-10 at 549]. A physical exam revealed no acute distress and a regular heart rate and rhythm, and that Mr. Anthony was oriented and moved all extremities well. [*Id.* at 550].

On September 29, 2017, Plaintiff presented to the hospital complaining of dizziness. *See* [#11-9 at 514]. A physical exam revealed no back pain or tenderness, intermittent headaches, no apparent distress, regular heart rate and rhythm, full strength in all extremities, normal gait, and normal psychological functioning. *See* [*id.* at 515-16]. An x-ray of his spine revealed mild intervertebral disc space narrowing at L3-4 and L2-3, slight sacroiliac joint asymmetry, no acute bony or joint abnormality, and moderate neural foraminal encroachment at L4-5; doctors diagnosed Mr. Anthony with acute right-sided lower back pain with right-sided sciatica. *See* [#11-9 at 522-24].

At an October 9, 2017 follow-up appointment, Mr. Anthony complained that he suffered from right-sided hip/low back pain that caused numbness down his right side through his leg and toes. [#11-10 at 551]. Progress notes indicate that Mr. Anthony was in no acute distress, ambulated well and had normal gait, moved all extremities equally, had normal lower extremity strength, and had minimal right lower back pain with flexion and extension of right knee. [*Id.* at

6

552]. His physical exam was within normal limits and his straight leg raise was negative. [*Id.*]. Mr. Anthony returned for a follow-up appointment on November 7, 2017 and reported that his lower back pain was worse upon twisting, but he denied pain radiating down his legs, numbness or tingling, or any shortness of breath or chest pain. [*Id.* at 553]. Doctors noted that recent lumbar x-rays revealed "evolving endplate osteophytes of moderate degree at the L3-4 level . . . [and] some mild intervertebral disc space narrowing at this level as well as at L2-3." [*Id.* at 555].

Despite continued complaints of lower back and toe pain in 2018, Mr. Anthony's subsequent physical exam results revealed no abnormalities. *See, e.g.*, [*Id.* at 557, 559, 561, 562-64]. February 2018 lumbar imagining revealed "moderate neural foraminal encroachment L4-5." [*Id.* at 566].

B.     **Procedural History**

On October 24, 2014, Plaintiff protectively filed his application for SSI. [#11-2 at 19; #11-3 at 75]. The Social Security Administration denied Plaintiff's application administratively on March 12, 2015. *See* [#11-3 at 75]. Mr. Anthony requested a hearing before an Administrative Law Judge ("ALJ"), which was set for March 28, 2017. *See* [#11-4 at 107-09]. Mr. Anthony failed to appear for the scheduled hearing because he was incarcerated, and ALJ Michael A. Kilroy dismissed Plaintiff's request for a hearing on April 18, 2017. *See* [#11-3 at 88-89]. Mr. Anthony appealed the Order of Dismissal to the Appeals Council which found Mr. Anthony's incarceration constituted good cause for his prior absence and therefore remanded the matter to an ALJ for a subsequent hearing. *See* [*id.* at 91-92]. On August 9, 2018,[2] ALJ Jennifer Fellabaum ("the ALJ")

---

[2] The hearing was originally set for April 19, 2018, but Mr. Anthony received a postponement of that hearing until August 9, 2018 so that he could secure a representative to assist with the hearing. *See* [#11-2 at 35-47].

7

held a hearing, at which she received testimony from Mr. Anthony and Vocational Expert Doris Shriver (the "VE"). *See* [#11-2 at 17, 48].

Mr. Anthony testified that he had been blind in his left eye since he was a teenager, which causes him to strain to see things with only his right eye and which interferes with his ability to drive. *See* [*id.* at 56-58]. He also suffered third-degree burns on his left arm, requiring skin grafts, which causes sharp pain, arthritis, and stiffness in his hand, and he explained that lifting, moving, using a hammer for too long, and heat exacerbate his pain. *See* [*id.* at 58-60]. Mr. Anthony further testified that his right ring finger is "bent" from a fracture and interferes with his ability to wear a glove on his right hand, clench his right hand into a fist, or use a wrench, though he can still write, hold a fork, tie his shoes, and button his pants. *See* [*id.* at 61, 65-66]. More recently, Mr. Anthony began experiencing lower back pain that spread from his right hip down his leg, which interfered with his ability to ambulate and bend. *See* [*id.* at 62-64]. He explained that over-the-counter pain medication does not provide relief for his pain and that his prescribed pain medication causes headaches and dizziness. *See* [*id.* at 67-68].

The VE also testified at the hearing. *See* [#11-2 at 69]. The VE first identified Mr. Anthony's past relevant work to include construction worker, a specific vocational preparation ("SVP")[3] of 4, and a heavy exertion job; and a lawn servicer, SVP of 4, and a heavy exertion job. *See* [*id.* at 71]; *see also* [*id.* at 56, 66-67 (Plaintiff testifying to his past work as a roofer, landscaper, and fairgrounds cleaner)]. The VE then testified that an individual of the same age, education, and

---

[3] SVP refers to the "time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation.'" *Vigil v. Colvin*, 805 F.3d 1199, 1201 n.2 (10th Cir. 2015) (citing Dictionary of Occupational Titles, App. C, Sec. II (4th ed., revised 1991)); 1991 WL 688702 (G.P.O.). The higher the SVP level, the longer time is needed to acquire the skills necessary to perform the job. Jeffrey S. Wolfe and Lisa B. Proszek, SOCIAL SECURITY DISABILITY AND THE LEGAL PROFESSION 163 (Fig. 10-8) (2003).

work experience as Mr. Anthony and limited to medium exertion work that required binocular vision and prohibited the climbing of ladders or scaffolds, driving, or exposure to heights or hazardous machinery <u>could not</u> perform this past relevant work. *See* [*id.* at 71]. Such an individual, the VE explained, <u>could</u> perform jobs as a dishwasher, hospital cleaner, and a dining room attendant—each SVP of 2 and medium exertion jobs. *See* [*id.* at 71-72]. And these jobs remained performable when adding additional limitations of no exposure to extreme heat, frequent bilateral fingering and handling, and frequent stooping, crouching, kneeling, and crawling. *See* [*id.* at 72-73]. The VE concluded that her testimony was not inconsistent with the Dictionary of Occupational Titles, supplemented by her skill as a vocational expert and occupational therapist. *See* [*id.* at 73].

On October 16, 2018, the ALJ issued a decision finding Mr. Anthony not disabled under the Act at step five, because Mr. Anthony could perform the jobs of dishwasher, hospital cleaner, and dining room attendant, which all existed in the national economy and were consistent with his RFC, age, education, and work experience. [#11-2 at 19-27]. Plaintiff requested Appeals Council review of the ALJ's decision, which the Appeals Council denied, rendering the ALJ's decision the final decision of the Commissioner. *See* [*id.* at 1-8]. Plaintiff sought judicial review of the Commissioner's final decision in the United States District Court for the District of Colorado on August 22, 2019, invoking this court's jurisdiction to review the Commissioner's final decision under 42 U.S.C. § 1383(c)(3).

On appeal, Mr. Anthony contends that substantial evidence does not support the ALJ's RFC assessment. For the following reasons, I respectfully disagree with Plaintiff and conclude substantial evidence supports the ALJ's RFC assessment.

9

## II. Step Four - The RFC Assessment

In formulating a claimant's RFC, the ALJ must consider the combined effect of all the claimant's medically determinable impairments, including the severe and non-severe. *See Wells v. Colvin*, 727 F.3d 1061, 1065 (10th Cir. 2013); *Ray v. Colvin*, 657 F. App'x 733, 734 (10th Cir. 2016). A claimant's RFC is the most work the claimant can perform, not the least. 20 C.F.R. § 404.1545; SSR 83-10. "'The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations).'" *Hendron v. Colvin*, 767 F.3d 951, 954 (10th Cir. 2014) (quoting SSR 96-8p, 1996 WL 374184, at *7 ("The RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence.")). If supported by substantial evidence, the court will not second-guess that determination. *See Frantz v. Astrue*, 509 F.3d 1299, 1300 (10th Cir. 2007).

The ALJ determined that Mr. Anthony retained the RFC to:

> perform medium work . . . except he can never climb ladders, ropes, or scaffolds, be exposed to unprotected heights or hazardous machinery. [Plaintiff] can frequently finger and handle with the left non-dominant upper extremity. He cannot operate a motor vehicle for commercial purposes. The jobs cannot be a job that requires binocular vision. [Plaintiff] cannot have concentrated exposure to extreme heat. Beginning on May 29, 2016, [Plaintiff] is further restricted to frequent bilateral fingering and handling. Beginning on October 9, 2017, through [October 16, 2018], [Plaintiff] is further restricted to frequent stooping, crouching, kneeling, and crawling.

[#11-2 at 21]. According to Mr. Anthony, substantial evidence does not support the ALJ's RFC assessment, because the medical evidence does not establish that Plaintiff can perform medium exertion work. *See* [#15 at 13-20; #19 at 2-7]. I respectfully disagree.

The ALJ's RFC assessment begins with a recitation of Mr. Anthony's hearing testimony and continues with a thorough discussion of the relevant medical evidence regarding Mr. Anthony's left-eye blindness, upper extremity burns, right ring finger fracture, and degenerative disc disease—a discussion like that above. *See* [#11-2 at 22-24]. For instance, the ALJ noted Mr. Anthony's range of motion and sensation improved with rehabilitation for his upper extremity burns and his right ring finger fracture caused additional complications largely because Mr. Anthony continued to utilize his right hand despite doctor's orders to rest his hand. *See* [*id.* at 22-23]. The ALJ also explained that Mr. Anthony retained normal strength in his upper extremities, which in conjunction with his improvement following rehabilitation for his upper extremity burns, limited Mr. Anthony to frequent handling and fingering. *See* [*id.*]. Regarding his degenerative disc disease, the ALJ recited the objective tests confirming the diagnosis and then discussed the objective medical evidence that indicated Mr. Anthony continued to perform yard and lawn work despite complaints of lower back pain, retained normal gait and strength in all extremities, had intact sensation and reflexes, retained full range of spinal motion, and had a negative straight raise despite some pain when rotating. *See* [*id.* at 23]. Based on this evidence, the ALJ limited Mr. Anthony to frequent stooping, crouching, kneeling, and crawling. *See* [*id.*].

Mr. Anthony raises several challenges to the ALJ's RFC assessment. He contends that the ALJ failed to explain how the objective evidence of his degenerative disc disease, upper extremity burns, and fractured right ring finger translated to frequent stooping, crouching, lifting, handling, and fingering. *See* [#15 at 16-19; #19 at 5-7]. He asserts instead that this objective evidence is "just as likely to support a restriction to light work" or only occasional stooping, crouching, lifting, handling, and fingering. *See* [#15 at 16-19; #19 at 5-7]. According to Mr. Anthony, the ALJ impermissibly substituted her own lay judgment as to Mr. Anthony's functional limitations, failed

11

to adequately develop the record, and failed to explain the reasons for these limitations. *See* [#15 at 16-20; #19 at 5-7].

The Commissioner responds, and the court agrees, that the ALJ undertook a comprehensive discussion of the entire medical record and Plaintiff's testimony regarding his functionality and his ailments, and adequately explained why the evidence supported the limitations found in Mr. Anthony's RFC. *See* [#18 at 6-9]. As mentioned, the ALJ thoroughly discussed the relevant medical evidence and linked that evidence to her limitations. *See* [#11-2 at 22-24]. To the extent the ALJ did not discuss evidence regarding Mr. Anthony's ability to lift fifty pounds, an additional component of medium exertion work, the ALJ need not identify "affirmative, medical evidence on the record as to each requirement of an exertional work level before [she] can determine RFC within that category." *Howard v. Barnhart*, 379 F.3d 945, 947, 949 (10th Cir. 2004). She did, however, adequately discuss the relevant medical evidence bearing on Mr. Anthony's ailments and functional limitations, which is sufficient. *See Hendron*, 767 F.3d at 954. And it is Mr. Anthony's burden to demonstrate his ailments cause specific functional limitations, *see Wilson v. Astrue*, 602 F.3d 1136, 1140-41 (10th Cir. 2010), which he has not done, *see Branum v. Barnhart*, 385 F.3d 1268, 1271 (10th Cir. 2004) ("[I]n cases such as this one where the claimant was represented by counsel at the hearing before the ALJ, the ALJ should ordinarily be entitled to rely on the claimant's counsel to structure and present claimant's case in a way that the claimant's claims are adequately explored, and the ALJ may ordinarily require counsel to identify the issue or issues requiring further development." (internal quotations omitted)). Indeed, a diagnosis alone does not equate to disability or any specific functional limitations. *See Paulsen v. Colvin*, 665 F. App'x 660, 668 (10th Cir. 2016) ("Diagnosis of a condition does not automatically mean that the claimant is disabled; what matters is whether the condition results in work-related limitations.").

Nor is the court convinced that the ALJ impermissibly substituted her own lay judgment for that of a medical expert in assessing Mr. Anthony's RFC. To be sure, an ALJ may not substitute her judgment for that of a medical expert or a treating source based on the ALJ's own speculation or lay opinion or on a finding that the plaintiff is not credible. *See Medina v. Berryhill*, No. 16-CV-01339-NYW, 2017 WL 1862279, at *8 (D. Colo. May 8, 2017). But "[a]n ALJ does not improperly assume the role of a medical expert by weighing the medical and non-medical evidence before rending an RFC finding." *Mullins v. Comm'r of Soc. Sec.*, No. 1:15-CV-104, 2015 WL 9854828, at *8 (S.D. Ohio Dec. 21, 2015). Indeed, the "ALJ, not a physician, is charged with determining a claimant's RFC from the medical record," and "there is no requirement in the regulations for a direct correspondence between an RFC finding and a specific medical opinion on the functional capacity in question." *Chapo v. Astrue*, 682 F.3d 1285, 1288 (10th Cir. 2012). Thus, the ALJ did not err in failing to obtain a physician opinion regarding Mr. Anthony's severe impairments, and the ALJ adequately linked specific medical evidence to her RFC assessment—nothing more is required.

Finally, I respectfully disagree that the ALJ failed to adequately develop the record. The duty to develop the record "is limited to fully and fairly developing the record as to material issues," and the burden lies with Mr. Anthony to demonstrate that further development is required. *Hawkins v. Chater*, 113 F.3d 1162, 1168 (10th Cir. 1997) (brackets and internal quotation marks omitted). "In the absence of such a request by counsel, [the court] will not impose a duty on the ALJ to order a consultative examination unless the need for one is clearly established in the record." *Id.* The record here does not clearly establish the need for a consultative exam. Thus, I find no error in this regard.

In sum, Mr. Anthony believes the medical evidence supports a limitation to light work, which under the appropriate guidelines and considering Mr. Anthony's age would render him disabled. But even if the medical evidence could support a limitation to light work—a conclusion not clear from the record before the court, I agree with the Commissioner that substantial evidence supports the ALJ's RFC assessment. *See Allman v. Colvin*, 813 F.3d 1326, 1333 (10th Cir. 2016) (explaining that it is the ALJ's, not the court's, responsibility to resolve inconsistencies in the medical record); *cf. Zoltanski v. FAA*, 372 F.3d 1195, 1200 (10th Cir. 2004) (explaining that the court may not "displace the agency's choice between two fairly conflicting views"). Mr. Anthony's arguments to the contrary invite the court to reweigh the medical evidence—an undertaking strictly prohibited. *See Newbold v. Colvin*, 718 F.3d 1257, 1262 (10th Cir. 2013). Accordingly, I find no error with the ALJ's RFC assessment.

## CONCLUSION

For the reasons stated herein, the court hereby **AFFIRMS** the Commissioner's final decision.

DATED: March 16, 2020

BY THE COURT:

_____
Nina Y. Wang
United States Magistrate Judge